482 A.2d 1076
**In the Matter of the ADOPTION OF April FERRANTE.**

**Appeal of Jean FERRANTE, Respondent and Natural Mother of April Ferrante, Appellant.**

Superior Court of Pennsylvania.

Argued June 9, 1983.

Filed Oct. 5, 1984.

Order Reversed April 12, 1985.

---

54

Anthony L. Gambatese, Erie, for appellant.

William A. Dopierala, Erie, for participating party.

Before CERCONE, President Judge, and SPAETH and HESTER, JJ.

## OPINION

CERCONE, President Judge:

This is an appeal from a final decree terminating the parental rights of appellant, Jean Ferrante in her daughter April Ferrante.

April was born on September 14, 1979. On October 16, 1979 she was taken to a hospital for a routine check-up where she was found to be suffering from burns and inflammation on her buttocks, legs, and heels believed to be caused by extended contact with urine. Children's Service of Erie County (Services) was contacted. Services filed a petition to have April declared a dependent child. She was released from the hospital on October 26, 1979, and was placed in foster care. The child was adjudicated dependent on November 2, 1979. On December 10, 1979, after a dispositional hearing, the foster care was continued with visitation rights in appellant and appellant was directed to cooperate with St. Vincent's Mental Health in a treatment program to be established.

Over the next eighteen months or so, various correspondences were exchanged between the court, Services, St. Vincent and other mental health and social welfare organizations or agencies concerning appellant's participation in the treatment program and her behavior towards April. On June 17, 1981, Services filed a petition to involuntarily terminate the parental rights of appellant. Testimony was taken on such petition on October 29, 1981, and on November 24, 1981. By decree dated August 4, 1982, the court refused to terminate appellant's parental rights and directed that visitation with April be resumed. The court ordered appellant to continue treatments and medication as ordered by appellant's psychiatrist and to attend counseling suggested by Services. Any change was to be reported to the court.

Services filed exceptions to the decree of August 4, 1982, as well as a petition for rehearing concerning the effect of the visitations upon April. Appellant filed a petition for

partial custody and termination of Services' supervision. Testimony was taken on the various matters on October 20, 1982, and the Orphans' Court by decree of October 25, 1982 terminated visitation until further testimony could be taken. Further testimony was heard on November 22, 1982, and by decree dated December 22, 1982, the court terminated appellant's parental rights to April, finding that April had been removed from appellant for more than six months. The conditions which led to the removal continued to exist, since appellant could not or would not remedy the conditions within a reasonable period, despite services or assistance available to her. Thus, the court found termination to be in April's best interest. Exceptions were filed and denied, and a final decree was entered. Appellant perfected this appeal.

Appellant's brief raises two questions. First, she contends that Services failed to meet its burden of proof by clear and convincing evidence. Her other contention is that the court erred in terminating her rights, when her mother and sister were willing to care for the child. This second argument will be addressed within our resolution of the first issue.

The standard of review in involuntary termination cases has recently been addressed by this court sitting *en banc* in *In Re Adoption of James J.*, 332 Pa.Superior Ct. 486, 481 A.2d 892 (1984).[1] There Judge Cavanaugh's lead opinion[2] held:

> [N]otwithstanding the *Santosky [v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)] opinion, we agree that abuse of discretion is the proper standard of review and most importantly that it best upholds due

1. The filing of this opinion was withheld pending the disposition of *James J.*

2. Two judges joined in Judge Cavanaugh's opinion; Judge Hoffman filed a concurring opinion in which he joined in the lead opinion as it addressed the standard of review but expounded upon the difference between *"standard* of review" and *"scope* of review"; and Judge Cirillo filed a dissenting opinion in which he concurred as to the standard of review but disagreed as to the resolution of the case when that standard was applied. Hence, five members of the court re-affirmed the "abuse of discretion" standard of review. The author of the instant opinion, in a Concurring and Dissenting Opinion joined by Judge Popovich, argued for a broader standard of review.

process concerns and serves the interests of the parties in a termination of parental rights case. We do not believe that *Santosky* has any effect on the existing standard of review or that by broadening the standard of review, parent's fundamental rights with respect to their children will be better protected. Therefore, we reject appellant's contention that the holding in *Santosky* mandates a broader scope of review than abuse of discretion.

In reaching the holding in *James J.*, Judge Cavanaugh was careful to distinguish between this court's duty to ensure that the record was thorough and complete and our responsibility of reviewing the lower court's ruling.[3] As he stated:

Insofar as termination cases are concerned, intimations of broad appellate review or broad scope of review should properly relate to the appellate court's duty to ensure that the trial court has satisfactorily fulfilled the requirements of examining all evidentiary resources, conducting a full hearing and setting forth its decision in a full discursive opinion. While, unlike custody cases, the termination cases have not repeatedly verbalized the requirement of comprehensiveness, it is clear from a reading of the cases that the requirement is engrafted on the law. *Accord, In Re Adoption of J.S.M., Jr.*, 492 Pa. 313, 424 A.2d 878; *In Re D.J.Y.*, 487 Pa. 125, 408 A.2d 1387 (1979); *In Interest of C.M.E.*, 301 Pa.Super. 579, 448 A.2d 59 (1982).

Nevertheless, a broad or searching review does not vest in the reviewing court either the duty or the privilege of making its own independent determination of fact, nor does it preclude an appellate court from using abuse of discretion as the appropriate standard of review. The purpose of employing broad and searching review is for the protection of the parties in ensuring that the inquiry of the lower court is complete and that its decision was made in accordance with the due process clause of the

3. For further elaboration on this distinction see Concurring Opinion by Hoffman, J.

Fourteenth Amendment in protecting the fundamental liberty interest of natural parents in their child. The purpose of employing the abuse of discretion standard of review, on the other hand, is to accord the trier of fact the appropriate deference as he has had the opportunity to observe the witnesses and evaluate their testimony, and by reason of his position is presumed to be practised and skilled in this responsibility.

(Cavanaugh, J. at 332 Pa.Superior Ct. ——, 481 A.2d at 894).

Returning our attention to the case at hand, we find that the Orphans' Court terminated appellant's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(5), which reads:

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

$$* \qquad * \qquad * \qquad * \qquad * \qquad *$$

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

Accordingly, we must review the record in light of the above standard of review and determine whether Services has demonstrated by clear and convincing evidence[4] the necessary elements of § 2511(a)(5). We may reverse the Orphans' Court order only if it is apparent that that court

4. This burden of proof is mandated. *See Santosky v. Kramer, supra; In Re Adoption of M.E.T.,* 313 Pa.Super. 316, 459 A.2d 1247 (1983). Here the Orphans' Court applied the correct standard.

abused its discretion, committed an error of law, or lacked evidentiary support for its findings.

The Orphans' Court found the following facts and circumstances determinative. The court found that at the time of April's birth appellant was experiencing physical and emotional problems. She was diagnosed as suffering from schizophrenia, paranoid type. Appellant did make some attempts to be helped but never fully realized the seriousness of her illness. While she did follow through with some counseling and medication, she did not do all she was directed to do. Her schizophrenia has gone into remission and she has become better acclimated since 1979. However, medical testimony shows she still can not raise the child on her own. Appellant continues to reside with her mother, April's maternal grandmother, who has agreed she would help appellant raise the child. However, the grandmother did not intervene in April's care prior to the child's hospitalization. Testimony demonstrated that appellant and her mother did not get along well together and appellant herself had testified that if she regained custody of April she would move away from the grandmother.

The court noted that while the mental illness was in a state of remission, appellant's condition had stabilized and would not improve further. At the time of the hearing she was still unable to properly care for the child. None of the medical witnesses could say whether appellant will remain stable. Visits with April had to be stopped as they were causing the child problems. The court later reinstituted visitation hoping that it might show some indications of a possibility of a future reunion between parent and child. The visitations proved to be unsuccessful and the court found it to be in the best interest of the child to continue separation and permit adoption by others.

Subsection (a)(5) of § 2511 was added to the Adoption Act by the Act of October 15, 1980. P.L. 934, No. 163, § 1; it went into effect January 1, 1981. This court has had only a few occasions to review its provisions. *See James J., supra; In Re Adoption of Sabrina,* 325 Pa.Superior Ct. 17,

472 A.2d 624 (1984); *Matter of Adoption of K.S.C.*, 309 Pa.Superior Ct. 550, 455 A.2d 1221 (1983); *In Interest of C.M.E.*, 301 Pa.Superior Ct. 579, 448 A.2d 59 (1982). Five requirements must be met before a parent's right may be terminated pursuant to § (a)(5). 1) The child must have been removed from its parents for at least six months. 2) The conditions which led to the initial removal continue to exist. 3) The parent cannot or will not remedy such condition within a reasonable time. 4) Services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal within a reasonable period. 5) Termination would best serve the needs and welfare of a child.

The trial court found all five requirements present. There is no question that April has been in foster care for greater than six months. However, appellant does dispute whether the conditions which led to April's placement continue to exist. We must look to the testimony to determine whether appellant's inabilities have been corrected. Our concern, as it is in custody situations, is with the present and the future, and past conduct is not relevant unless it has an ongoing effect upon the child. *See, Commonwealth ex rel. Gorto v. Gorto*, 298 Pa.Superior Ct. 509, 444 A.2d 1299 (1982).

There is no dispute that appellant was suffering from a severe mental illness at the time April was brought to the attention of Services and that April was detrimentally affected by it. Similarly, there is no question that appellant, at the time of the hearings, was mentally much better than when the child was removed, as her illness was in a state of remission. All witnesses agreed that the disorder could reoccur in the future although they were unable to predict when, if ever, it would resurface. However, among the witnesses there was disagreement as to what lasting effect the illness had upon appellant's ability to parent.

Dr. De Sai, a child psychiatrist who had observed the interaction between April and her mother and her grandmother, testified that schizophrenia leaves a severe disabili-

ty. (N.T. 11/22/82, p. 59). A schizophrenic can not return to normal and the illness will affect parenting to the extent the child could become psychotic. (Id. at 76). Following such an illness, some people may be able to rear children, some may not, and the patients who are dependent on others do not make good parents. (Id. at 77). Dr. De Sai believed that appellant needed someone to structure her life and that she would not allow her mother to take care of her. (Id. at 82–85). He concluded that appellant, by herself, would not be able to care for April. (Id. at 79).

Dr. Gustin, another psychiatrist, also evaluated appellant. He was concerned about her lack of insight into her psychological difficulties and over her use of denial and minimization of her disabilities as well as her lack of cooperation in a treatment program and her inability to take constructive criticism. (N.T. 7/29/82 p. 5). He doubted whether "she would be able to provide ongoing sustained parenting for her child at this time." (Id.)

A third psychiatrist, Dr. Singh, had treated appellant for her mental illness, and has earlier testified that he saw no reason to believe that appellant could not parent the child. (N.T. 10/29/81 and 10/24/81 p. 190). Despite her failure to follow the devised treatment plan and to follow regular counseling, her condition was the best he had ever seen of her. (Id. at 194, 202.) Appellant's mental health counselor also testified. In his opinion, while appellant could not care for the child by herself, she could with the grandmother's assistance and Services' supervision, and no harm would come to the child. (Id. at 35.)

Turning to the relationship between appellant and the child's maternal grandmother the testimony revealed the following. The grandmother did not intervene in the child's care prior to the child's hospitalization. The grandmother attributed this to her fear of appellant while appellant was at the height of her illness. (N.T. 10/24/81 p. 18.) Several caseworkers and the foster mother testified that the grandmother was mainly responsible for the interaction between mother and child during the visits. (Id. at 71, 112.) One

caseworker observed a great deal of conflict between mother and grandmother (Id. at 71), while another one did not. (Id. at 112.) A friend of the grandmother's never observed appellant and the grandmother fighting. (Id. at 145.) All of such testimony was heard more than a year before the order of termination.

Appellant's actual parenting abilities were discussed at length at the hearing on October 29, 1981. The evidence discloses that at earlier visitations appellant had no knowledge of basic child care; she required constant monitoring; she had not developed parenting skills; she even had difficulty in changing a diaper; she was unable to anticipate the child's actions and needs; and that she was unable to care for the child. Dr. De Sai observed appellant shortly before the November 22, 1982 hearing. He found the mother's behavior was regressive, i.e., she treated April as if the child was much younger. In his opinion she needed parenting skills. No bonding was noticed between parent and child even after, what in his opinion was, a maximum effort to lessen April's anxiety and promote the development of bonding. (Id. at 56–57).

The Orphans' Court found that "the credible medical testimony ... clearly shows that [appellant] cannot on her own raise the child." (Slip opinion p. 3). The court concluded that while appellant lives with her mother, and the mother has agreed to help raise the child, appellant and her mother "have not gotten along too well." (Id. at 4.) It was also noted that the appellant testified that she intended to move away from her mother taking April with her if she were successful in regaining custody. (Id.)[5]

But for Dr. Singh's testimony, the remainder of the testimony from the other expert witnesses, the case workers, and the foster mother support the trial court's finding that appellant was unable to care for the child and that it was unlikely that she could on her own remedy such within

---

**5.** Her actual testimony was that she planned on moving out when she got a job and setting up her own apartment. She intended on leaving April in the grandmother's care when she went to work. (N.T. 10/20/82 p. 31).

a reasonable time.   Compare, *Interest of C.M.E.*, *supra.*
As we echoed in *Matter of Adoption of Barnett*, 304
Pa.Super. 514, 521, 450 A.2d 1356, 1359–60 (1982):

> The adjudication of the Orphans' Court will not be
> disturbed if "the record is free from legal error and … if
> the chancellor's findings are supported by the competent
> and adequate evidence, and are not predicated upon capri-
> cious disbelief of competent and credible evidence." *In
> Re Burns*, 474 Pa. 615, 624, 379 A.2d 535, 540 (1977).   As
> the Supreme Court said *In Re Adoption of P.*, 475 Pa.
> 197, 380 A.2d 311 (1977), the fact-finding function of the
> hearing judge and his unique opportunity to observe the
> witnesses and to appraise their credibility is to be recog-
> nized.   Nevertheless, the Court noted that the appellate
> courts may not abdicate the responsibility of considering
> all of the testimony and determining whether those find-
> ings are supported by competent evidence.   The Court
> wrote,

> [W]e also have a responsibility to make certain that the
> trial court has properly interpreted the law in relationship
> to the express findings of facts and other uncontradicted
> testimony which was not expressly rejected by the trial
> court.   While we will not unsurp the trial court's right to
> assess the credibility of the witnesses appearing before
> him, we will not condone his ignoring facts which are of
> record and the credibility of which is not challenged.
> Id., 475 Pa. at 204 n. 6, 380 A.2d at 314 n. 6.

We may not fault the court as to its findings that appellant
was incapable of caring for April if found upon clear and
convincing evidence.

█ Here the court apparently discounted Dr. Singh's
testimony.   While Dr. Singh was appellant's psychiatrist
and therefore most familiar with her mental state, he had
never observed her interaction with April.   While Dr. Singh
could testify, that in his opinion, such mental illness would
not interfere with the raising of a child and that he had seen
such patients adequately raise children, he was unable to
express any opinion as to the actual quality of appellant's

parenting abilities. Therefore the court could properly rely upon those who had made such observations or had reviewed others' observations.

The testimony of Dr. De Sai, Dr. Marks, a psychologist, and the foster mother clearly demonstrates that the once a week visits were having a detrimental effect upon April. This was physically demonstrated by bed-wetting, poor appetite, hyperactivity and poor sleeping. Emotionally, the child's insecurity was expressed by crying, temper tantrums, and a need for reassurance from the foster mother. The child's change in temperament was expressed in such terms as "unbearable", "there was no living with her", "she carried on", "she would not listen", "she was rebellious", "she mimicked people", "she jumped on furniture", "she was very demanding", "she was fussy", and "nothing pleased her." Such behavior was attributed to the anxiety being caused by the attempt to form a bond between the child and appellant. The child would not initiate any interaction with appellant. Both Dr. De Sai and Dr. Marks believed the child was experiencing a great deal of stress.

Dr. Marks was concerned because the child was regressing and he feared the child might suffer a "psychotic episode". In his opinion the child was not going to improve with increased or further visitation. (10/20/82 pp. 93–95). He believed the child would be unable to handle such visits for another year or two. (Id. at 109–10). However *if* the child was going to be eventually reunited with her mother, visitation should *not* cease entirely as the child would become more bonded with the foster parents. (Id. at 110–11). He would have liked to give the child a month or two without visitation in order for her to stabilize. (Id. at 112).

As previously mentioned, Dr. De Sai believed the maximum effort had been made to lessen the anxiety. However, the child was reacting so much, that if visitation continued, it would result in a further deterioration in behavior. (N.T. 11/22/82 pp. 58–59). He recommended *against* further attempts to forming a bond between appellant and the child.

(Id. at 64). He thought all visitation should be stopped for one to two years. (Id. at 73).

■ We must agree with the trial court that the evidence was clear and convincing that discontinuation of visitation at the time of its order to terminate would best serve the needs and welfare of the child. However, the question which the Orphans' Court had to struggle with, and which we too must face and resolve is not whether visitation should be halted, but rather, whether appellant's parental rights should be *totally* extinguished. As we said in *Interest of C.M.E.*, 301 Pa.Superior Ct. at 586–87, 448 A.2d at 63:

> Because of the importance placed on the family, the Commonwealth may disrupt the parent-child relationship only upon clear showing of necessity; moreover, even if removal is necessary to protect the child, every effort should be made to reunite the family. *In Re Adoption of R.I.*, 468 Pa. 287, 361 A.2d 294 (1976), appeal dismissed, U.S. cert. denied, 429 U.S. 1032, 97 S.Ct. 722, 50 L.Ed.2d 743 (1977).

We further stated:

> A parent, whose child has been placed in foster care, has an affirmative duty to work towards the return of the child, but *even if there has been a long separation* occasioned by parental neglect or incapacity, termination of parental rights cannot be ordered if there is a reasonable possibility that the causes and conditions which have led to the separation can be remedied and the family restored. *In Re William L.*, [477 Pa. 322, 383 A.2d 1228 (1978)]. (Emphasis supplied.)

The resolution of this current appeal hinges on whether, with assistance and the available services, appellant could, within a reasonable time resume her parental duties. The matter is complicated by the child's need to avoid such frequent visitation for a period of one to two years. However, § 2511(a)(5) requires a court to determine *both* whether a parent's difficulties can be remedied *and* also whether termination would be in the interest of the child. We believe the "and" linking these two requirements should be

read in the conjunctive and hence each element must be proven.[6]

■ The chronology of this case makes our review much more difficult to carry out. The hearings were separated by eleven months and both the parties and courts have tended to blend the testimony together. While the chancellor found the evidence presented in the first hearings inadequate to justify termination, he takes into account such testimony to support his decision to terminate appellant's parental rights after the second hearings. Termination should be based on current and future inability to care for a child and not on a parent's past performance. While a court must look to the past to determine if progress has been made, it should not rely on the past state of things unless such conditions continue at the time of decision. The circumstances surrounding the current case make it difficult to determine what the current situation was at the time the termination order was signed.

The testimony on the original petition to terminate was concluded on November 24, 1981 and yet the trial court did not hand down its decision until August 4, 1982. This delay was apparently caused by a delay in transcribing the notes of testimony which were filed of record on June 1, 1982. Appellant should not be punished for such delay. Unfortunately for appellant she was not permitted to visit April between June 17, 1981, when Services filed its petition, and the August 4, 1982 order. There is no wonder that April did not adjust to the renewed visitation which lasted five

6. We must acknowledge that the legislature by enacting subsection (b) to § 2511 requires:

> (b) Other considerations.—The court in terminating the rights of a parent shall give primary considerations to the needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of a parent.

As the Orphans' Court terminated appellant's parental rights under § (a)(5), we must not limit our review only to the child's best interest. Instead we must determine if all five of the elements listed above have been met.

weeks before Services sought reconsideration.[7] A month after the petition for reconsideration was filed, the court terminated visitation. Therefore, appellant and April were allowed approximately ten weeks, an hour a week, to form a mother-child bond, after being separated for approximately fourteen (14) months. While the order of August 4, 1982 called for appellant to attend counseling arranged for by Services, no counseling was provided or suggested.

When analyzing a parent's performance, we should measure such performance in light of what we would expect an individual to do in circumstances similar to those in which a parent finds himself or herself. *In Re Adoption of B.D.S.*, 494 Pa. 171, 431 A.2d 203 (1981); *Matter of M.L.W.*, 307 Pa.Superior Ct. 29, 452 A.2d 1021 (1982). In appellant's case we must determine whether a parent who last sees her child, when the child is twenty-one (21) months old, and then does not see the child again until the child is thirty-five (35) months old, may be expected to form a bond with the child within ten weeks [8] and to know the proper parental behavior for a child of such age. In analyzing the situation we must assume that any interaction with the child when she was young was hampered by the parent's severe mental disorder. We do not mean to place ourselves above those experts, who testified within the realm of their expertise, and we do not doubt that April has experienced great stress, however our responsibility is to determine whether there is clear and convincing evidence of appellant's inability, within a reasonable time, in light of the assistance available to her, to care for the child. Although the psychiatrist's and psychologist's opinions appear to be based on the child's best interest such is not sufficient by itself. *See Matter of M.L.W.*, 307 Pa.Superior Ct. at 36, 452 A.2d at 1025.

---

7. We realize that Services was under a duty to bring the court's attention to any adverse affects of visitation; however, we may not condone a premature renewed effort to seek termination of parental rights. *See Matter of M.L.W.*, 307 Pa.Superior Ct. at 36, 452 A.2d at 1025.

8. We are not including the November 1982 sessions with Dr. De Sai.

■ The Orphans' Court itself was not satisfied that termination was proper as of August 4, 1982. Services had not carried its burden. By orders of that date Services was to provide appellant with counseling. It apparently did not. Subsequently, testimony was for the most part directed at the adverse reaction April was displaying. While there was testimony as to appellant's skills, there was no indication that Services had attempted, since August 4, 1982, to assist appellant in improving her skills.[9] The basis for the termination appears to be April's negative reaction as well as appellant's failure to develop, without counseling, the appropriate parenting skills. To rely heavily upon April's adverse reaction to justify termination was unreasonable in light of the testimony that April's current state of development was not conducive to attempting new bonding between her and her mother. The witnesses recommended waiting another year or two. Either appellant was so incompetent as a parent that she would not within a reasonable time be able to care for April or else given another year or two she could possibly renew a relationship with April. From the record it is unclear which was the correct view. Assuming that the passage of a year or two would better enable the reunion of parent and child, it was improper to hurry to extinguish appellant's rights. Termination of parental rights is such a drastic measure that all concerned should tread with care. In light of the above and since there was no evidence that Services performed its crucially important duty to help appellant to develop parenting skills, we believe Services failed to carry its burden.

We find support for our holding in those cases which have reviewed § 2511(a)(5).

A majority of the court in *James J.* found that the fact that the father had been admitted, on several occasions, to a mental hospital did not demonstrate an incapacity to parent. The record was bare as to the details of treatment, diagno-

---

9. Throughout the proceedings various witnesses had expressed their concern over appellant's prior failure to carry through on psychological or mental health counseling. Such should not be confused with counseling to be provided by Services.

sis and prognosis. Further, the evidence was conflicting concerning the father's interaction with the child. The court ignored the undisputed fact that the father had increased his visitation and his claim that he had not wanted to interfere with the "natural mother's nurturing responsibilities." His financial situation had improved, resulting in a corresponding improvement in his situation generally. We found that the father had clearly demonstrated a desire to learn and assume parental duties. We concluded that the elements of § 2511(a)(5) had not been proven by clear and convincing evidence.

However, *In Re Adoption of Sabrina, supra,* an order terminating parental rights was affirmed. There, the mother of "limited intellectual capabilities" refused to cooperate so as to attain the necessary skills and stability or reform her bad habits. She demonstrated a lack of care and concern toward children. She failed to utilize the resources available to assist in her parental education and personal counseling and to take advantage of assistance given in finding employment, housing and "even to be released from prison." Therefore the elements of § 2511(a)(5) were proven by clear and convincing evidence.

In *Interest of C.M.E., supra,* we found that while the record supported a finding of the parent's repeated and continued incapacity to care for a child due to her limited intellectual ability, the record revealed only a half-hearted attempt to assist her in remedying her deficiency. It was determined that she could be rehabilitated to care for the child within two and one-half (2½) years. Such period was not an unreasonable period to allow her to correct her deficiency. Hence, termination under § 2511(a)(5) was impermissible.

Similarly in *Adoption of K.S.C., supra,* this court found the evidence insufficient under subsection (a)(5). The evidence was meager and vague as to the initial placement and as to whether conditions had changed. Of special interest to the current appeal is the fact that there the children became unruly after visitation and the children did not want to see their mother. Nonetheless, termination was held to

be improper at that time, as it was specifically noted, the statute required the court to consider what assistance was offered by the agency. The record showed that no assistance had been offered.

Were we here to affirm the order of the Orphans' Court we would be in effect holding that when a child is removed from a parent suffering from a serious psychological disorder, which requires an extended period of recuperation, during which any existing parent-child relationship grows distant, then social agencies need not attempt to help the parent, but instead could move to terminate his or her parental rights. Such would be contrary to the requirements of the Adoption Act. Of even more concern is the current situation. Services, having failed to convince the court of appellant's incapacity, could then subsequently rely upon its own inaction and the breach in the parent-child relationship, caused by its prior attempt to terminate, to justify a second petition. We find such would be an abuse of the Adoption Act.

In the current case it appears appellant would be dependent on others to assist her. Section (a)(5) specifically acknowledges and approves such dependence. While we can not say that appellant will be a successful parent if assistance is provided, we also can not say she would not. Services having failed to offer such assistance and allowing it a reasonable opportunity to be effective has failed to carry its burden of clear and convincing evidence. Therefore, we must reverse the order terminating appellant's parental rights.[10]

Order reversed.

HESTER, J., filed a dissenting statement.

HESTER, Judge, dissenting:

I respectfully dissent. My review of the record leads me to conclude that in terminating the parental rights of appellant, the court below did not abuse its discretion, did not

10. We would hope that all concerned with April's welfare would offer their assistance in attempting to establish and monitor a visitation program between appellant and April.

commit an error of law and there was overwhelming competent and adequate evidentiary support for its findings. April was born September 14, 1979. She was but 32 days old when she was admitted into the hospital suffering from extreme neglect. She has been in foster care ever since. Appellant is schizophrenic. She will never be normal, and the illness will affect parenting to the extent the child could become psychotic. At the time of the hearing, she had stabilized but would never improve further and was still unable to properly care for April. Schizophrenia leaves a severe disability. Appellant has been accorded every possible opportunity to acquire the parenting skills required to raise an active, normal child such as April. Not only is she unable to take care of April, she has difficulty in taking care of herself.

By enacting 23 Pa.C.S.A. § 2511(b), the Legislature has mandated that in terminating the rights of a parent the court shall give primary consideration to the needs and Welfare of the child. April is now 5 years old. If she is to have any opportunity to lead a normal life in a normal environment, the parental rights of Appellant must be terminated. I would affirm the action of the court below.